No. 23-1565

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

JAMES HARPER,

*Plaintiff-Appellant,*

v.

DANIEL WERFEL, in his official capacity as
Commissioner of the Internal Revenue Service; and
INTERNAL REVENUE SERVICE,

*Defendants-Appellees.*

On Appeal from the United States District Court
District of New Hampshire
No. 1:20-cv-00771-JL, Hon. Joseph N. Laplante

# BRIEF OF AMICUS CURIAE
# AMERICANS FOR PROSPERITY FOUNDATION
# IN SUPPORT OF
# PLAINTIFF-APPELLANT AND REVERSAL

Ryan P. Mulvey
  First Circuit Bar No. 1174492
Lee A. Steven
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Boulevard, Suite 1000
Arlington, VA 22203
571-444-2841
rmulvey@afphq.org
lsteven@afphq.org

October 19, 2023          *Attorneys for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1(a) and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *amicus curiae* Americans for Prosperity Foundation states that it is a not-for-profit corporation, does not have a corporate parent, does not issue stock, and no publicly held corporation owns 10 percent or more of it.

# TABLE OF CONENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES .................................................................. iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* .............................. 1

SUMMARY OF ARGUMENT .................................................................. 1

ARGUMENT ......................................................................................... 3

    I.    The meaning of the Fourth Amendment is rooted in the
common law of trespass. .......................................................... 3

    II.   The lower court misapplied the trespass-based
approach to Fourth Amendment jurisprudence. .................. 14

CONCLUSION ..................................................................................... 20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyd v. United States,*
  116 U.S. 616 (1886) ................................................................ 9–11

*Byrd v. United States,*
  584 U.S. ___, 138 S. Ct. 1518 (2018) ........................................... 3, 6

*Carpenter v. United States,*
  585 U.S. ___, 138 S. Ct. 2206 (2018) ............ 3–4,8, 11, 14–16, 18–19

*Entick v. Carrington,*
  95 Eng. Rep. 807 (C.P. 1765) ...................................................... 7–9

*Florida v. Jardines,*
  569, U.S. 1 (2013) ............................................................ 4–5, 12–13

*Katz v. United States,*
  389 U.S. 347 (1967) ...................................................................... 5

*Smith v. Maryland,*
  442 U.S. 735 (1979)) ..................................................................... 5

*Soldal v. Cook Cty,*
  506 U.S. 56 (1992) ........................................................................ 6

*Stanford v. Texas,*
  379 U.S. 476 (1964) ................................................................. 7, 12

*United States v. Jones,*
  565 U.S. 400 (2012) ...................................................... 4–7, 11, 18

*United States v. Knotts,*
  460 U.S. 276 (1983) ................................................................... 6–7

*United States v. Miller,*
  425 U.S. 435 (1976) ............................................................. 5, 16–19

*Warden, Md. Penitentiary v. Hayden,*
  387 U.S. 294 (1967) ................................................................. 11, 15

## Constitution, Statutes, and Other Authorities

U.S. Const., amend. IV ................................................................ 4

26 U.S.C. § 7609(f) ................................................................... 2

26 U.S.C. § 7609(h)(2) .............................................................. 2

3 Joseph Story,
*Commentaries on the Constitution of the United States* § 1902
(1833) .......................................................................... 9–10

Richard A. Epstein,
Entick v. Carrington *and* Boyd v. United States: *Keeping the
Fourth and Fifth Amendments on Track,*
82 U. Chi. L. Rev. 27 (2015) ......................................... 8–9

## BRIEF OF *AMICUS CURIAE*
## IN SUPPORT OF PLAINTIFF-APPELLANT

Pursuant to Rule 29 of the Federal Rules of Appellate Procedure, Americans for Prosperity Foundation ("AFPF") respectfully submits this *amicus curiae* brief in support of Plaintiff-Appellant Mr. Harper.[1]

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

AFPF is a 501(c)(3) nonprofit organization committed to educating and training Americans to be courageous advocates for the ideas, principles, and policies of a free and open society. Those key ideas include constitutionally limited government and individual constitutional rights. As part of this mission, AFPF regularly appears as *amicus curiae* before state and federal courts.

## SUMMARY OF ARGUMENT

This case concerns an Internal Revenue Service ("IRS") "John Doe" summons, which, as the lower court explained, "is, in essence, a direction to a third party to surrender information concerning taxpayers whose

---

[1] Pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure, this brief is filed with the consent of all the parties. In compliance with Rule 29(a)(4)(E), AFPF affirms that no counsel for a party authored this brief in whole or in part and no person other than *amicus curiae* or its counsel made any monetary contributions intended to fund the preparation or submission of this brief.

identity is currently unknown to the IRS." JA 76. That summons, generally authorized under 26 U.S.C. §§ 7609(f) and 7609(h)(2), did not identify Mr. Harper by name, nor did it concern a particularized allegation that Mr. Harper was likely involved in criminal activity or any other wrongdoing. As applied to Mr. Harper, the summons was issued without probable cause and acted no differently than a general warrant that has long been anathematized in both the English and American legal traditions. Nevertheless—or to be more accurate, consequently—Mr. Harper's private financial records, which did not demonstrate any tax delinquency or other wrongdoing, were swept up in the records that ultimately were turned over to the IRS. *See* JA 78–79; Pl.-Appellant's Opening Br. at 1. Mr. Harper owned a possessory interest in those records. As applied to Mr. Harper in this case, the execution of the IRS summons violated Mr. Harper's constitutional rights under the trespass-based approach to Fourth Amendment jurisprudence recently re-emphasized by the United States Supreme Court. The lower court judgement must be reversed.

# ARGUMENT

## I. The meaning of the Fourth Amendment is rooted in the common law of trespass.

The fundamental purpose of the Fourth Amendment is "to secure the privacies of life against arbitrary power . . . [and] to place obstacles in the way of a too permeating police surveillance." *Carpenter v. United States*, 585 U.S. ___, 138 S. Ct. 2206, 2214 (2018) (cleaned up). Likewise,

> [f]ew protections are as essential to individual liberty as the right to be free from unreasonable searches and seizures. The Framers made that right explicit in the Bill of Rights following their experience with the indignities and invasions of privacy wrought by general warrants and warrantless searches that had so alienated the colonists and had helped speed the movement for independence. Ever mindful of the Fourth Amendment and its history, the Court has viewed with disfavor practices that permit police officers unbridled discretion to rummage at will among a person's private effects.

*Byrd v. United States*, 584 U.S. ___, 138 S. Ct. 1518, 1526 (2018) (cleaned up).

But it was precisely the "unbridled discretion to rummage at will among a person's private effects," *id.*, that the IRS exercised in this case, in violation of Mr. Harper's Fourth Amendment rights.

The proper means to vindicate the purposes of the Fourth Amendment, the Supreme Court has explained in recent jurisprudence

(but given short shrift here by the lower court), is to return to first principles. The Fourth Amendment protects the "right of the people to be secure in their *persons, houses, papers, and effects*." U.S. Const., amend. IV (emphasis added). That text, explained the Court in *United States v. Jones*, "reflects [the Fourth Amendment's] close connection to property, since otherwise it would have referred simply to 'the right of the people to be secure against unreasonable searches and seizures'; the phrase 'in their persons, houses, papers, and effects' would have been superfluous." 565 U.S. 400, 405 (2012). *Jones* was decided, the Court later explained, "based on the Government's *physical trespass* of the vehicle" upon which the FBI had placed a tracker. *Carpenter*, 138 S. Ct. at 2215 (emphasis added). Similarly, in *Florida v. Jardines*, the Court emphasized that the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by *physically intruding* on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." 569, U.S. 1, 5 (2013) (cleaned up and emphasis added).

Thus, where there is a physical trespass—on "persons, houses, papers, or effects"—the question of "reasonable expectations of privacy," as first articulated by Justice Harlan's concurring opinion in *Katz v. United States*, 389 U.S. 347 (1967), and applied by the federal courts in numerous Fourth Amendment cases thereafter,[2] is not the only or even primary test to apply in adjudicating claims of Fourth Amendment violations. The reasonable-expectations-of-privacy test is *in addition* to the core trespass-based test contained in the express text of the Amendment. As *Jardines* explained: "The *Katz* reasonable-expectations test has been added to, not substituted for, the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." 569 U.S. at 11 (cleaned up); *see id.* ("Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz*. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically

---

[2] *See, e.g.*, JA 82–87 (lower court relying on *United States v. Miller*, 425 U.S. 435 (1976) and *Smith v. Maryland*, 442 U.S. 735 (1979)).

intruding on Jardines' property to gather evidence is enough to establish that a search occurred."); *see also Jones,* 565 U.S. at 406–07 ("Jones's Fourth Amendment rights do not rise or fall with the *Katz* formulation. At bottom, we must assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates. *Katz* did not repudiate that understanding.") (cleaned up); *id.* at 408 ("*Katz* did not narrow the Fourth Amendment's scope."); *Byrd,* 138 S. Ct, at 1526 ("[M]ore recent Fourth Amendment cases have clarified that the test most often associated with legitimate expectations of privacy, which was derived from the second Justice Harlan's concurrence *in Katz v. United States*, supplements, rather than displaces, the traditional property-based understanding of the Fourth Amendment.") (cleaned up); *Soldal v. Cook Cty*, 506 U.S. 56, 64 (1992) ("But the message of those cases [*i.e.*, those in the line of *Katz*] is that property rights are not the sole measure of Fourth Amendment violations. . . . There was no suggestion that this shift in emphasis had snuffed out the previously recognized protection

for property under the Fourth Amendment."); *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J., concurring) (*Katz* did not erode the principle "that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment even if the same information could have been obtained by other means.").

To help make the point that the Fourth Amendment is rooted in the common law of trespass, the *Jones* court quoted Lord Camden's famous opinion in *Entick v. Carrington*, 95 Eng. Rep. 807 (C.P. 1765). *See* 565 U.S at 405. *Entick* was one of a series of English cases decided in the mid-1760s that condemned the use of general warrants that had allowed the seizure of individuals, and their books and papers, based on the mere allegation of seditious libel for advocating political views disfavored by the Crown. The Supreme Court summarized this history and context in *Stanford v. Texas*:

> It was in enforcing the laws licensing the publication of literature and, later, in prosecutions for seditious libel that general warrants were systematically used in the sixteenth, seventeenth, and eighteenth centuries. In Tudor England officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan. In later years warrants were sometimes more specific in content, but they

typically authorized the arrest and search of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named person thought to be connected with a libel. It was in the context of the latter kinds of general warrants that the battle for individual liberty and privacy was finally won—in the landmark cases of *Wilkes v. Wood* and *Entick v. Carrington*.

379 U.S. 476, 482–83 (1964); *see Carpenter*, 138 S. Ct. at 2213 ("The Founding generation crafted the Fourth Amendment as a response to the reviled general warrants and writs of assistance of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.") (cleaned up).

Understanding the facts and context of *Entick* is instructive, as they parallel what the government did in the instant case. Far from a particularized description of the evidence to be seized, the warrant at issue in *Entick* granted the government agents permission to search Entick's premises for papers and any other evidence that could then be used as grounds for bringing a claim of seditious libel against him. As one commentator has summarized:

The defendants were four of the King's messengers who had acted pursuant to a warrant "to search for and seize the plaintiff and his books and papers" that was issued by Lord Halifax, who had recently been appointed secretary of state. The defendants broke into Entick's home "with force and arms" and then proceeded over the next four hours to break

down doors and open locks in an effort to find evidence of
seditious libel that could lead to a criminal prosecution.

Richard A. Epstein, Entick v. Carrington *and* Boyd v. United States*:*

*Keeping the Fourth and Fifth Amendments on Track*, 82 U. Chi. L. Rev.

27, 29 (2015).

In *Boyd v. United States*, the Supreme Court quoted the judgment

of Lord Camden in *Entick* at length and characterized it "as one of the

landmarks of English liberty." 116 U.S. 616, 626 (1886). It further

explained its importance to the U.S. Constitution:

> [Lord Camden's judgment] was welcomed and applauded by
> the lovers of liberty in the colonies as well as in the mother
> country. It is regarded as one of the permanent monuments of
> the British Constitution, and is quoted as such by the English
> authorities on that subject down to the present time. As every
> American statesmen, during our revolutionary and formative
> period as a nation, was undoubtedly familiar with this
> monument of English freedom, and considered it as the true
> and ultimate expression of constitutional law, it may be
> confidently asserted that its propositions were in the minds of
> those who framed the Fourth Amendment to the Constitution,
> and were considered as sufficiently explanatory of what was
> meant by unreasonable searches and seizures.

*Id.* at 626–27; *see* Epstein, *supra,* at 32 ("The most obvious way to

examine these clauses [*i.e.,* the Fourth and Fifth Amendments] is to note

that they are clearly an effort to mimic in the Bill of Rights the protection

that Lord Camden offered in *Entick* against 'a warrant to search and

seize' the plaintiff's papers."); 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1902 (1833), *available at* https://lonang.com/library/reference/story-commentaries-us-constitution/sto-344/ (last visited October 18, 2023) (the Fourth Amendment "seems indispensable to the full enjoyment of the rights of personal security, personal liberty, and private property. It is little more. than the affirmance of a great constitutional doctrine of the common law. And its introduction into the amendments was doubtless occasioned by the strong sensibility excited, both in England and America, upon the subject of general warrants almost upon the eve of the American Revolution.").

In further explaining the relevance of *Entick* in the American context, the *Boyd* court stated that the violent manner in which the search took place was not the essence of the violation, but the direct trespass of an innocent man's security and property (which included his papers and effects):

> The principles laid down in this opinion affect the very essence of constitutional liberty and security. . . . It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; *but it is the invasion of his indefeasible right of personal security, personal liberty and private property*, where that right has never been forfeited by

> his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Campden's judgment.

116 U.S. at 630 (emphasis added); *see Carpenter*, 138 S. Ct. at 2313 ("The basic purpose of this Amendment, our cases have recognized, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.") (cleaned up).

Thus, the meaning of *Entick,* and the numerous Supreme Court cases since that have hearkened back to it to explain the Fourth Amendment, is that government acts illegitimately when, without a proper nexus to an actual crime,[3] or a properly particularized warrant,[4] it vacuums up an individual's papers and effects or otherwise intrudes on an individual or his property in an attempt to find or secure evidence not

---

[3] *See Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967) ("There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.").

[4] *Hayden*, 387 U.S. at 309 ("But if its rejection [of the 'mere evidence' rule] does enlarge the area of permissible searches, the intrusions are nevertheless made after fulfilling the probable cause and particularity requirements of the Fourth Amendment and after the intervention of 'a neutral and detached magistrate.").

yet in its possession. *See Jones*, 565 U.S. at 408 n.5 ("[A] seizure of property occurs, not when there is a trespass, but when there is some meaningful interference with an individual's possessory interests in that property. Likewise with a search. Trespass alone does not qualify, but there must be conjoined with that what was present here: an attempt to find something or to obtain information. . . . A trespass on 'houses' or 'effects,' or a *Katz* invasion of privacy, is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy.") (cleaned up); *Stanford*, 379 U.S. at 486 ("Two centuries have passed since the historic decision in *Entick v. Carrington*, almost to the very day. The world has greatly changed, and the voice of nonconformity now sometimes speaks a tongue which Lord Camden might find hard to understand. But the Fourth and Fourteenth Amendments guarantee to John Stanford that no official of the State shall ransack his home and seize his books and papers under the unbridled authority of a general warrant—no less than the law 200 years ago shielded John Entick from the messengers of the King."); *see also Jardines*, 569 U.S. at 7, 8–9 ("[A]n officer's leave to gather information is sharply circumscribed when he

steps off those [public] thoroughfares and enters the Fourth Amendment's protected areas. . . . [A] police officer not armed with a warrant may approach a home and knock . . . [b]ut introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else.").

This understanding of the Fourth Amendment, rooted in the government's trespass of "persons, houses, papers, and effects" in the "hopes of discovering incriminating evidence," applies directly to the instant case. It is undisputed that the IRS had no prior evidence of any wrongdoing by Mr. Harper and that its only purpose in executing the summons—at least as applied to Mr. Harper—was a speculative hope that it might find such evidence. Moreover, in the lower court, Mr. Harper raised a Fourth Amendment argument rooted in trespass in addition to an argument that the government had violated his reasonable expectations of privacy. *See infra* Sec. II. The lower court resolved the case primarily on the latter claim while only briefly addressing the former. But, as the above shows and the Supreme Court has stated expressly, the "*Katz* reasonable-expectations test has been added to, not

substituted for, the traditional property-based understanding of the Fourth Amendment." *Jardines,* 569 U.S. at 10.

To summarize: The Fourth Amendment is implicated whenever there is a trespass by the government on a person, or his house, papers, or effects, in an attempt to secure information not yet in its possession. In such circumstances, there is no need to assess whether a plaintiff's reasonable expectations of privacy have been violated.

## II. The lower court misapplied the trespass-based approach to Fourth Amendment jurisprudence.

The lower court did recognize that "Courts have utilized a property-based or 'common-law trespass' approach as well as a privacy-based approach to determining whether Fourth Amendment interests are implicated." JA 81–82 (citing *Carpenter*, 138 S. Ct. at 2213). Nevertheless, almost the entirety of its Fourth Amendment analysis was based on the *Katz* "reasonable-expectation-of-privacy" test. *See* JA 82–87. The lower court's discussion of Mr. Harper's alternative Fourth Amendment argument rooted in trespass was perfunctory and, in the end, relied primarily on *United States v. Miller*—a case that applied only a privacy-based analysis—to conclude that no Fourth Amendment violation had occurred. JA 87–88.

But there can be no doubt that a trespass-cum-search-and-seizure occurred in this case and that it was unreasonable and unjustified. Mr. Harper's private financial records were collected without his authorization and turned over to the IRS under the terms of a general summons that swept up everyone who met the general conditions of that summons—that is, without even a claim that Mr. Harper was likely to have been involved in a tax delinquency or any other wrongdoing. Indeed, it is undisputed that Mr. Harper has never been named in or otherwise connected to a crime over which the IRS has jurisdiction and that he has in fact complied with all applicable provisions of the tax code. *See* JA 18 (Compl. ¶¶ 64–66); Pl.-Appellant's Opening Br. at 1. The search and seizure was thus conducted without probable cause, without a particularized description of Mr. Harper, and without an alleged nexus between Mr. Harper and an actual crime. In short, there was no "cause to believe that the evidence sought [would] aid in a particular apprehension or conviction." *Hayden*, 387 U.S. at 307.

The best description of the summons used to justify the search and seizure of Mr. Harper's private financial records was that it operated as a general permission allowing the IRS to go fishing for possible evidence

of a crime. But as *Carpenter* explains, "our cases establish that warrantless searches are typically unreasonable where a search is undertaken by law enforcement officials to discover evidence of wrongdoing. . . . The Court usually requires some quantum of individualized suspicion before a search or seizure takes place." 138 S. Ct. at 2221 (cleaned up). Such "individualized suspicion" was wholly lacking here and, thus, an unreasonable search and seizure occurred.

The only possible grounds to uphold the lower court's decision, therefore, turns on its finding that the financial records at issue belong to Coinbase rather than Mr. Harper. *See* JA 87 ("*Miller's* holding that a bank customer has neither a property interest nor a reasonable expectation of privacy in the bank's records for his account applies with equal force to Harper's Coinbase account records."). But that conclusion was erroneous because it failed to account for *Miller's* commitment to treating Fourth Amendment rights as wholly a matter of privacy, certain distinctions between the two sets of records at issue, and the *Miller*

court's underlying assumption regarding the ownership of the records at issue in that case.[5]

*First*, as *Miller* explained: "We must examine the nature of the particular documents sought to be protected in order to determine whether there is a legitimate 'expectation of privacy' concerning their contents." 425 U.S. at 442. The Court's understanding of the records at issue, in other words, was inexorably intertwined with—read through the lens of—the idea of privacy; for that reason alone, application of *Miller* to a trespass-based Fourth Amendment claim is improper.

*Second*, at least some of the records at issue in *Miller* could rightly be considered, as a matter of property law, no longer the property of the plaintiff because they were checks and thus "not confidential communications but negotiable instruments to be used in commercial transactions." *Id.* That contrasts with Mr. Harper's records here, all of which concern his personal identifying information, his "records of account activity . . . identifying the date, amount, and type of

---

[5] In other words, as Justice Gorsuch explained in dissent in *Carpenter*, under the traditional trespass approach, "Fourth Amendment protections for your papers and effects do not automatically disappear just because you share them with third parties." 138 S. Ct. at 2268 (Gorsuch, J., dissenting).

transaction," and other similar account statements. *See* JA 88. These were records particular to Mr. Harper and over which he retained control—no party had a right of access to those records except Mr. Harper and Coinbase pursuant to their contractual agreements.[6] They recorded his individual decisions concerning the amounts and timing of his deposits and withdrawals, and such records would not have existed but for those individual decisions. *See* Pl.-Appellant's Opening Br. at 20–23.

*Third*, the *Miller* court's characterization of the records at issue in that case actually assume—and thus demonstrate—the plaintiff's ownership of, or at least a cognizable property or possessory interest in,[7] them. Thus, the Court noted that "[a]ll of the documents obtained, including financial statements and deposit slips, contain only

---

[6] *Cf. Carpenter*, 138 S. Ct. at 2269–70 (Gorsuch, J., dissenting) ("I doubt that complete ownership or exclusive control of property is always a necessary condition to the assertion of a Fourth Amendment right. Where houses are concerned, for example, individuals can enjoy Fourth Amendment protection without fee simple title. Both the text of the Amendment and the common law rule support that conclusion. . . . Another point seems equally true: just because you have to entrust a third party with your data doesn't necessarily mean you should lose all Fourth Amendment protections in it.").

[7] *Cf. Jones*, 565 U.S. at 408 n.5 ("[A] seizure of property occurs . . . when there is some meaningful interference with an individual's possessory interests in that property.").

information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. . . . The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." 425 U.S. at 442–43. But one cannot "reveal his affairs" or "voluntarily convey information" to another party if one's affairs and information are not already one's own. Further, the nature of any such "conveyance" in the context of financial services is one of bailment, not absolute relinquishment, otherwise the customer would never have the right to access and secure those records at his convenience or prevent others from accessing them. *See* Pl.-Appellant's Opening Br. at 21–23 (discussing concept of bailment).

Justice Gorsuch explained the bailment concept in his dissent in *Carpenter*:

> [T]he fact that a third party has access to or possession of your papers and effects does not necessarily eliminate your interest in them. Ever hand a private document to a friend to be returned? Toss your keys to a valet at a restaurant? Ask your neighbor to look after your dog while you travel? You would not expect the friend to share the document with others; the valet to lend your car to his buddy; or the neighbor to put Fido up for adoption. Entrusting your stuff to others is a bailment.

138 S. Ct. at 2268–69. And Justice Gorsuch specifically distinguished this understanding from that used in *Miller*, noting that whereas Fourth

Amendment rights might be extinguished under the reasonable-expectation-of-privacy rubric, "property law may preserve them." *Carpenter*, 138 S. Ct. at 2269; *see id.* ("These ancient principles may help us address modern data cases too. Just because you entrust your data—in some cases, your modern-day papers and effects—to a third party may not mean you lose any Fourth Amendment interest in its contents.").

Under the applicable common law principles of trespass, it cannot be doubted that this case involved an unreasonable search and seizure of Mr. Harper's papers and effects and that Mr. Harper's Fourth Amendment rights were thereby violated.

## CONCLUSION

For the foregoing reasons, the Court should reverse the lower court order dismissing this case for failure to state a claim.

Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
  First Circuit Bar No. 1174492
Lee A. Steven
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Boulevard, Suite 1000
Arlington, VA 22201
571-444-2841
rmulvey@afphq.org
lsteven@afphq.org

October 19, 2023

*Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because, excluding the parts of the document exempted by Rule 32(f), this brief contains 4277 words.

This brief also complies with the typeface requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey

Dated:  October 19, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2023, I electronically filed the above Brief of *Amicus Curiae* Americans for Prosperity Foundation in Support of Plaintiff-Appellant with the Clerk of the Court by using the appellate CM/ECF system. I further certify that service will be accomplished by the appellate CM/ECF system.


*/s/ Ryan P. Mulvey*
Ryan P. Mulvey

Dated: October 19, 2023